# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | Crim. No. 2:14-cr-69-JDL-5 |
| DIMITRY GORDON, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT DIMITRY GORDON'S MOTION TO SUPPRESS**

Dimitry Gordon seeks to suppress wiretap evidence as violating the requirements of 18 U.S.C.A. §§ 2510-2522 (the "Wiretap Statute"). ECF No. 452. Gordon also requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). *Id.* Co-defendants Carrie Buntrock and Alcindy Jean-Baptiste join in the motion. ECF Nos. 478 and 498. For the reasons discussed below, I deny the motion.

## I. FACTUAL BACKGROUND

There have been four wiretap applications submitted by the Government in this case. The first, filed on February 24, 2014, sought authorization to intercept wire and electronic communications occurring over the cellular telephone numbers (207) 330-5654 ("Target Telephone #1" or "TT1") and (207) 713-0380 ("Target Telephone #2" or "TT2"). ECF No. 566 at 1. Accompanying the application was an 88-page supporting affidavit submitted by Task Force Agent ("Agent") Joey Brown (the "February 24 Affidavit"). *Id.* The Court granted the application, and issued an order and an amended order authorizing interceptions of wire and electronic communications occurring over both TT1 and TT2, respectively (the "February 24

1

Order"). Interception of TT1 began on February 26, 2014. Interception of TT2 began on February 25, 2014. *Id.* at 1-2.

The second application was submitted on March 25, 2014. It sought authorization to continue intercepting wire and electronic communications occurring over TT1 and TT2 for an additional 30 days. *Id.* at 2. The application was accompanied by Agent Brown's 83-page supporting affidavit (the "March 25 Affidavit"). *Id.* The Court granted the application and issued orders authorizing interceptions of wire and electronic communications occurring over both numbers (the "March 25 Order"). Interceptions pursuant to these orders began on March 25, 2014. *Id.*

The third application was submitted on April 24, 2014. The Government again sought renewed authorization to continue intercepting wire and electronic communications occurring over TT1, plus authorization to intercept wire and electronic communications occurring over the cellular telephone number (857) 236-2924 ("Target Telephone #4" or "TT4"). *Id.* Agent Brown submitted an 86-page affidavit supporting the application (the "April 24 Affidavit"). *Id.* The Court granted the application and issued orders authorizing interceptions of wire and electronic communications occurring over TT1 and TT4 (the "April 24 Order"). Interceptions pursuant to these orders began on April 24, 2014. *Id.*

The Government submitted its final application on May 1, 2014, seeking authorization to intercept wire and electronic communications occurring over the cellular telephone number (207) 240-3478 ("Target Telephone #5" or "TT5"). *Id.* at 3.

The application was accompanied by a 69-page supporting affidavit from Agent Brown (the "May 1 Affidavit"). *Id*. The Court granted the application and issued an order authorizing interceptions of wire and electronic communications occurring over TT5 (the "May 1 Order"). Interceptions pursuant to this authorization began on May 1, 2014. *Id*.

On December 9, 2014, a grand jury returned a Second Superseding Indictment against Gordon and nine co-defendants, charging Gordon with one count of conspiracy to distribute and possession with intent to distribute heroin, cocaine, and oxycodone in violation of 21 U.S.C.A. §§ 846 and 841(a)(1) ("Count One"), and one count of conspiracy to commit money laundering, in violation of 18 U.S.C.A. § 1956(a)(1)(B)(i) ("Count Eight"). ECF No. 531.

A hearing was held on Gordon's motion to suppress on January 28, 2015. Following the hearing, I ordered the Government to submit an affidavit identifying the statistical summaries previously prepared regarding the wire and text message interceptions; explaining the categories of information identified in the summaries; and summarizing all of the data contained in the individual summaries. In response, the Government submitted the affidavit of Agent Brown on February 13, 2015. *See* ECF No. 683.

## II. GORDON'S MOTION TO SUPPRESS

Gordon seeks to suppress the intercepted communications on four grounds: (A) the Court's wiretap Orders do not comply with the requirements of the Wiretap Statute and are "insufficient on their face;" (B) the Government's wiretap applications

3

failed to establish necessity; (C) the Government failed to minimize its surveillance in accordance with the Court's wiretap Orders and the Wiretap Statute; and (D) the wiretap applications relied heavily on unnamed informants whose credibility either was not established or was compromised. ECF No. 452 at 2-17. I address each argument in turn.

A.  **Alleged Failure to Conform to 18 U.S.C.A. § 2518(4)**

Gordon argues that the wiretap orders are facially deficient because they fail to describe the particular type of communication that the Government sought to intercept and the particular offenses to which they relate, as required by 18 U.S.C.A. § 2518(4)(c).[1] ECF No. 452 at 4. With regard to the "type of communication," Gordon asserts that the wiretap orders authorized the interception of an overly broad range of telephone communications by including not just communications from the target telephone numbers, but also from other telephone numbers that were subsequently assigned to or used by devices bearing the same electronic serial number, or "IMEI number." *Id.* (quoting the February 24 Order at 4, and the March 25 Order at 6) (quotations omitted). As to statements of particular offenses, Gordon objects that the wiretap Orders are overbroad because they merely cite the criminal statutes to which the Orders relate, instead of describing specific criminal acts. *Id.* at 4-5 (citing the February 24 Order). Finally, Gordon objects that the wiretap orders fail to

---

[1] 18 U.S.C.A. § 2518(4)(c) provides:

> Each order authorizing or approving the interception of any wire, oral, or electronic communication under this chapter shall specify a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates[.]

4

specifically identify the government agency authorized to intercept communications, as required by § 2518(4)(d).[2] *Id.* at 5. Instead, Gordon claims that the reference in the wiretap Orders to DEA agents and other law enforcement officers and civilian monitors "allow[s] virtually anyone employed in law enforcement or an investigative role and, apparently, private individuals with government contracts to conduct the intercepts." *Id.* at 5-6.

Gordon's arguments fall short for several reasons. *See id.* at 3-7. The wiretap Orders adequately describe the type of communication to be intercepted: they specify the telephone numbers and electronic serial numbers in question and extend monitoring permission to numbers accessed through them and to changed telephone numbers assigned to a particular landline telephone. *See United States v. Worthy*, 2012 WL 3960315, at *5 n.4 (D. Me. Sept. 10, 2012). The wiretap Orders also "enumerate the federal crimes being investigated, along with statutory citations." *Id.* This is sufficient to comply with § 2518(4)(c). Furthermore, the listening post where the intercepts took place "was designated as the DEA Resident Office in Portland Maine, and the authority of other law enforcement officers therefore reasonably is understood as in assistance of the DEA." *Id.* This identifies the government agency authorized to intercept communications and is sufficient to comply with § 2518(4)(d).

---

[2] 18 U.S.C.A. § 2518(4)(d) provides:

> Each order authorizing or approving the interception of any wire, oral, or electronic communication under this chapter shall specify the identity of the agency authorized to intercept the communications, and of the person authorizing the application[.]

5

Finally, Gordon cites to no published decisions in support of his view of what the law requires.

**B.     Necessity**

The necessity requirement restricts wiretapping to situations where traditional investigative techniques are not sufficient to expose criminal activity. *See United States v. Rivera-Rosario*, 300 F.3d 1, 19 (1st Cir. 2002). "[A] wiretap application [must] include 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. López*, 300 F.3d 46, 52 (1st Cir. 2002) (quoting *United States v. Hoffman*, 832 F.2d 1299, 1306 (1st Cir. 1987)).

The necessity requirement does not require the Government to "show that other investigatory methods have been completely unsuccessful," *Rivera-Rosario*, 300 F.3d at 19, and the Government need not "demonstrate that it exhausted all investigative procedures." *United States v. Santana*, 342 F.3d 60, 65 (1st Cir. 2003). Instead, the Government need only show that it "has made a reasonable good faith effort to run the gamut of normal investigative procedures" before resorting to a wiretap. *Id.* The court may also take into account the nature of the alleged crimes and give weight to the opinion of the investigating agents that other means were too dangerous and possibly counterproductive. *In re Dunn*, 507 F.2d 195, 197 (1st Cir. 1974).

6

Gordon argues that normal investigative techniques were already leading the Government to its intended targets, and that wiretaps, while more convenient, were not necessary for the investigation to be successful. ECF No. 452 at 9. For example, Gordon notes that the Government conducted traffic stops and controlled purchases of drugs from co-defendants in this case, seizing large amounts of cash and drugs, yet released the co-defendants instead of charging them and seeking their cooperation. *Id.* (citing the May 1 Affidavit at ¶¶ 20(f), 28, 43, 72, 84). He claims that this renders "any asserted 'necessity' for wiretaps . . . essentially a fiction." *Id.* Gordon also argues that any necessity is wasted away by the Government's obtaining authorization for a "tracker" to be placed on a co-defendant's vehicle, and by the fact that the Government had already obtained text messages sent by the target telephones.[3] *Id.* at 10-11.

Gordon's necessity argument conflicts with the First Circuit's admonitions in *Rivera-Rosaria* and *Santana* that the Government need not show that other investigative techniques have been completely unsuccessful, or that it has exhausted all investigative procedures, before applying for a wiretap. *See Rivera-Rosario*, 300 F.3d at 19. *See also, Santana*, 342 F.3d at 65. Agent Brown's affidavits provided detailed explanations for why traditional investigative methods had not been

---

[3] Gordon also claims that the Government "offer[ed] no reasonable basis" for failing to conduct additional surveillance within an apartment building in Lewiston, Maine, and notes Agent Brown's statement that additional surveillance would have been useful. *See* ECF No. 452 at 10 (citing the May 1 Affidavit at ¶ 109). This argument misconstrues what Agent Brown stated in the warrant affidavit. The surveillance to which Gordon refers took place in a vacant unit within an apartment building located on Knox Street in Lewiston which served as co-defendant Romelly Dastinot's suspected distribution location. May 1 Affidavit at ¶¶ 107-108. Agent Brown explained that this surveillance came to an early end when the vacant unit was rented and investigators lost access to the apartment. *Id.* Agent Brown also stated that "surveillance *from within the building*" was useful, not the undifferentiated "additional surveillance" to which Gordon refers. *Id.* at ¶ 109.

7

successful in achieving the stated primary goals of the investigation: to identify sources of drug supply for the targets of the investigation and other significant co-conspirators. *See* May 1 Affidavit, ¶ 72. Agent Brown described law enforcement's use of confidential sources and cooperating defendants who were able to purchase drugs from co-defendant Romelly Dastinot and others, but who could not "provide specific details concerning the inner-workings of this drug trafficking conspiracy and [ ] state sources of supply." *Id.* at ¶¶ 81-99. Agent Brown also described the Government's use of pen registers, its efforts at physical surveillance, and its financial investigation, all of which occurred prior to the wiretap application. *Id.* at ¶¶ 105-127. Brown also addressed numerous investigative methods that the Government considered and rejected as being either too dangerous or too likely to alert the people being investigated. *Id.*

The portrait of the investigative efforts painted by Agent Brown's affidavit demonstrates that the conspiracy's sources of supply were unlikely to be identified through traditional law enforcement techniques and that the wiretaps "[were] necessary to uncover the full scope of the conspiracy, including conclusive proof of identity and information as to how the drug sales were made." *Santana*, 342 F.3d at 66.

**C. Minimization**

Court orders permitting electronic monitoring of communications must require that the monitoring "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception[.]" 18 U.S.C.A. § 2518(5). Each

8

of the four wiretap Orders in this case contained this requirement, and investigators listening to intercepted phone calls pursuant to a wiretap Order were required to stop listening and recording when it became apparent that a conversation was innocent in nature, and not related to the investigation. Investigators could sample the call intermittently thereafter, however, to determine if the conversation had moved to the topic of the investigation.

As explained in *Worthy*, the suppression of evidence based on a failure to minimize is reserved for blatant and egregious violations:

> According to the Supreme Court, "[t]he statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States,* 436 U.S. 128, 140 (1978). The only case I have found where a district judge actually granted relief suppressing all intercepted communications was reversed on appeal. *United States v. Scott,* 331 F.Supp. 233 (D.D.C. 1971), *rev'd,* 504 F.2d 194 (D.C.Cir. 1974). The First Circuit has referred in dictum to the possibility of such relief, but only for the "particularly horrendous" case, where "agents acted in such blatant and egregious disregard of the minimization order that no lesser sanction will serve." *United States v. Hoffman,* 832 F.2d 1299, 1309 (1st Cir. 1987), quoted approvingly in *United States v. Charles,* 213 F.3d 10, 23 (1st Cir. 2000) ("taint upon the investigation as a whole sufficient to warrant [such] sweeping relief"), quoted in turn approvingly in *United States v. Baltas,* 236 F.3d 27, 32 (1st Cir. 2001).

*Worthy,* 2012 WL 3960315, at *2.[4]

Gordon does not seek to suppress individual communications that he claims should not have been intercepted. Rather, he argues that the government's wiretapping procedures were so tainted by a widespread failure to minimize that *no*

---

[4] In *Worthy*, Judge Hornby addressed substantially similar minimization arguments as those Gordon raises here.

recorded conversation or text message should be heard or seen by the jury, regardless of whether that particular communication was properly minimized and recorded and is otherwise admissible as evidence. ECF No. 452 at 16-17 ("Defendant submits that the appropriate remedy in this case is suppression of all of the intercepted communications and the fruits of those communications.") (citing *Hoffman*, 832 F.2d at 1307-08; *United States v. Baltas,* 236 F.3d 27, 32 (1st Cir. 2001)).

Gordon makes four points in support of his assertion of a systematic failure. First, the investigators failed to accurately record their minimization efforts, and those records which do exist are "misleading, confusing, internally inconsistent," and demonstrate that the Government inflated its minimization efforts. *Id.* at 12. Second, the statistical summaries provided by the Government demonstrate that the percentage of minimized calls was too low. *Id.* at 14-15 (citing *United States v. Rizzo*, 491 F.2d 215, 217 n.7 (2nd Cir. 1974); *United States v. Armocida*, 515 F.2d 29, 43 (3rd Cir. 1975)). Third, the Government failed to minimize a phone discussion between co-defendants Dastinot and Azor regarding their attorney fees. *Id.* at 15-16. Finally, Gordon claims that the Government has not produced periodic reports of its monitoring as required by the wiretap Orders. *Id.* at 16.

The government's adherence to the minimization requirement is measured by several factors, including: "(1) the nature and complexity of the suspected crimes; (2) the thoroughness of the government's precautions to bring about minimization; and (3) the degree of judicial supervision over the surveillance process." *United States v.*

*López,* 300 F.3d at 57 (citing *United States v. London,* 66 F.3d 1227, 1236 (1st Cir. 1995)).

With regard to the first *Lopez* factor, because the investigation in this case involved a drug ring of unknown proportions, "the need to allow latitude to eavesdroppers is close to its zenith," and "[t]he need is but heightened because the conspiracy involves controlled substances—easily concealed, easily transported, likely to implicate international or at least interstate interests." *Hoffman,* 832 F.2d at 1308. *See also United States v. Bennett,* 219 F.3d 1117, 1124 (9th Cir. 2000) (in such cases "the need to allow latitude to monitoring agents is paramount"); *United States v. Hyde,* 574 F.2d 856, 869 (5th Cir. 1978) ("It was appropriate for agents investigating this widespread [drug] conspiracy to monitor calls more extensively than might have been appropriate in a simpler case."). Leeway is appropriate in drug conspiracy investigations because individuals engaged in the drug trade commonly use coded language and nicknames. *Hoffman,* 832 F.2d at 1308 ("When the opposition speaks in tongues, there is a greater need to listen longer and more closely to conversations which may seem more innocuous at first.").

The foregoing considerations apply here and the first *Lopez* factor is easily met for several reasons. The drug ring was of unknown proportions during most of the investigation. Also, many of the intercepted conversations were in the Haitian Creole dialect and the speakers employed coded terms. Further, as the Government has emphasized, "the co-conspirators in this case rarely, if ever, referred to one another by their legal names and most used phones which were not in their true names." ECF

No. 566 at 15. Given the challenges confronting the investigators in understanding what was said, who was speaking, and, overall, the scope and breadth of the conspiracy, this is a case in which substantial leeway is justified.

Regarding the second *Lopez* factor, the Government's reports to the Court, all filed under seal, show that the government took responsible steps to minimize in this case. Prior to the commencement of the interception period, the Government held minimization meetings or telephone conferences with law enforcement personnel for each phone line. At those meetings, the government reviewed the minimization requirements set forth in the court orders as well as the procedures for minimizing. The agents and monitoring personnel minimized calls on all monitored lines. *See* ECF Nos. 683-1 through 683-11.

Regarding the third *Lopez* factor, the Orders required periodic progress reports, which were made after 15 days and again when the wiretaps were closed. These periodic reports provided details about the operation of the wiretaps and summarized the call line sheets.

Gordon dismisses the Government's minimization records as "bogus," claiming that they render an accurate analysis impossible because "they are misleading, confusing, [and] internally inconsistent" and also claiming that the records demonstrate that the Government "dramatically inflated its minimization efforts." ECF No. 452 at 12, 14. Gordon also argues that the percentage of calls minimized is too low: "It is simply unbelievable [that] only one percent of the 18,651 interceptions at issue merited minimization of some kind." ECF No. 452 at 14-15. Gordon supports

his argument by noting that the Government intercepted "many" text messages, and at least three calls which contained no audio at all. ECF No. 452 at 13. However, text messages can be excluded from the number of minimized calls "given the impossibility of minimizing a text message." *United States v. Worthy*, 2012 WL 3960315, at *3 (D. Me. Sept. 10, 2012). As to the three minimized calls for which there was no audio, the calls were logged by a computer without human involvement, and were not included in the report to the court. *See* ECF No. 566 at 17-18 (citing intercept session numbers 88, 89, and 545).

Furthermore, Gordon's characterization of the percentage of minimized calls in relation to the total number of interceptions does not fairly reflect the minimization efforts that were undertaken. A total of 23,543 completed calls were intercepted. ECF No. 683-11 at 1. Of these, 7,965 were SMS (text) messages. Of the remaining intercepted completed calls, 1,616 were greater than two minutes in duration. Agents minimized 229 of these calls, representing approximately 14 percent of the total number. *Id.*; ECF No. 683 at 5, ¶ 11. That a relatively high percentage of the calls greater than two minutes in duration were minimized is significant because of the need for investigators to monitor a call at its outset before they can reasonably determine that the conversation is not headed toward a subject relevant to the investigation and, therefore, minimization is required. In *Scott*, 436 U.S. at 140-42, the Supreme Court recognized that one factor bearing on the reasonableness of minimization efforts is the number of short calls intercepted. Several other decisions have drawn temporal lines in arguing the reasonableness of minimization efforts in

recognition that it is difficult to minimize short-duration calls. *See United States v. Yarborough*, 527 F.3d 1092, 1098 (10th Cir. 2008) ("[C]onsistent with Supreme Court and Tenth Circuit precedent, in analyzing reasonableness of the government's minimization efforts, we exclude calls under two minutes."); *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992) (concluding that not minimizing calls of two minutes or less was reasonable); *United States v. Cleveland*, 964 F. Supp. 1073, 1094-95 (E.D. La. 1997) (excluding calls of less than three minutes from review). The "one percent" figure cited by Gordon thus misses the mark. The government's minimization of 14 percent of the calls greater than two minutes in length reflects that the affiants took their minimization responsibilities seriously.

Gordon also cites in support of his argument Session 6559,[5] a telephone call that the Government intercepted but did not minimize. Gordon contends that "much of the call appears to relate merely to whether fees charged by a lawyer representing one of the participants were reasonable." ECF No. 452 at 15-16.

Session 6559 consists of a discussion between co-defendants Romelly Dastinot and Pierre Azor that occurred five days after Azor was stopped and arrested for being in possession of 1,075 30-mg oxycodone pills. ECF No. 566 at 17. During their discussion, Azor described the traffic stop and the state charge resulting from it, in addition to the reasonableness of his attorney's fees. *Id.* The fact that Dastinot's and Azor's otherwise pertinent conversation was interspersed with a discussion about

---

[5] In his motion, Gordon cites to Session 6569. ECF No. 452 at 15. However, the Government asserts that Session 6569 was in fact an unanswered call, and "assumes that Gordon is referencing Session 6559." ECF No. 566 at 17.

14

Azor's attorney fees does not render the entire call innocuous. *See United States v. Hurley*, 63 F.3d 1, 17 (1st Cir. 1995). Nor does this fact constitute evidence tending to show or suggest "a pattern of listening to calls after it became clear that the calls were innocuous." *Id.* (quotation omitted).

Finally, Gordon complains that the Government failed to provide him with its bi-monthly progress reports to the Court. ECF No. 452 at 16. Progress reports are to be filed with the judge "at such intervals as the judge may require," and "are offered solely to aid the issuing judge, and the sufficiency of these reports is a matter for the issuing judge." *United States v. Rose*, 2012 WL 1744757, at *1 (D. Mass. May 16, 2012) (quotations omitted). "Courts generally deny requests to discover interim progress reports." *United States v. Abdul-Ahad*, 2008 U.S. Dist. LEXIS 109041, at *20 (D. Minn. Oct. 27, 2008). "Progress reports are, for the most part, a summary of information already provided to defendants, i.e. the tapes, summaries and logs. Those items . . . are the original and best sources of information regarding statutory compliance." *Rose*, 2012 WL 1744757, at *3 (quoting *United States v. Orozco,* 108 F.R.D. 313, 316 (S.D. Cal. 1985)) (quotation marks omitted). Thus, Gordon was provided the information needed to evaluate and challenge the wiretaps, and he has not established that the progress reports are material to preparing his defense.

Based on (1) the nature and complexity of the alleged drug conspiracy at issue here; (2) the steps taken by the Government to effect minimization; (3) the substantial number of calls greater than two minutes in duration that were minimized, and (4) the regular judicial supervision over the surveillance process, I am satisfied that the

Government's minimization efforts were reasonable and provide no support for the suppression of the intercepted communications.

**D.    Credibility of Unnamed Informants**

Gordon challenges the credibility of two of the confidential sources ("CSs") and one of the cooperating defendants ("CDs") whom the Government relied upon in its affidavits supporting the wiretap applications. ECF No. 452 at 18-19. He asserts that CS1 provided "false information to the government, was intercepted placing drug orders, and was ultimately arrested for possession of cocaine." *Id.* He also asserts that CS 5 used "illegal drugs throughout his or her period of cooperation," and that CD7 "apparently lied to the government on at least one occasion" and "was in fact a significant crack cocaine tracker." *Id.* Gordon also argues that the use of confidential informants places him at "an incredible disadvantage in assessing the credibility of the informants;" requests that the Government be ordered to reveal their identities; and that an evidentiary hearing be held to determine their credibility. *Id.* at 19.

Gordon's attack on the credibility of CS1, CS5, and CD7 ignores the other methods and sources the Government employed to obtain information to establish probable cause, including other confidential sources and cooperating defendants, as well as controlled drug purchases, physical surveillance of the targets, and analysis of phone data. ECF No. 566 at 22. Furthermore, as this Court has previously noted, "the First Circuit has explicitly held that unnamed informants can form the basis for probable cause so long as the issuing court can assess the credibility of the informant's information." *United States v. Noonan,* 2014 U.S. Dist. LEXIS 119294,

at * 21 (D. Me. Aug. 27, 2014) (citing *United States v. Barnard,* 299 F.3d 90, 93 (1st Cir. 2002)). "In analyzing the weight to give informant information, a court can consider such factors as the credibility and reliability of the informant, the specificity of the information, the basis of the informant's information (i.e. whether the information is first hand or hearsay), the timeliness of the information and whether the information is corroborated." *Id.* (citing *United States v. Gonzalez,* 190 F.3d 668, 672 (5th Cir. 1999)).

Applying these factors to this case, the Government notes that "the February 24 Affidavit outlined information from ten informants," most of whom provided information that came from first-hand dealings with members of the alleged conspiracy, thus enhancing their credibility. ECF No. 566 at 23 (citing *Barnard*, 299 F.3d at 94). The information provided by CS1 "was directly corroborated through controlled purchases at agents' direction," and was timely because it was provided to agents as the controlled purchase was taking place. *Id.* The Government also states that information from certain confidential informants was cross-corroborated by information from other confidential informants, further enhancing the credibility of that information. *Id.* (citing *Barnard,* 299 F.3d at 94).

Thus, the degree of collaboration present here undercuts Gordon's argument. In addition, "[t]he reliability of the source information is not altered by the fact that the sources' identities remain protected—the information provided by the sources was timely, detailed and corroborated by other source information and other avenues."

17

*Noonan,* 2014 U.S. Dist. LEXIS 119294, at *22. I conclude that the wiretap applications were supported by sufficient probable cause.

### III. REQUEST FOR EVIDENTIARY HEARING

Gordon claims that an evidentiary hearing is required because "the motion to suppress presents a colorable constitutional claim involving material issues of fact." ECF No. 452 at 19 (quoting *United States v. Tagliamonte*, 340 Fed. App'x. 73, 76 (3rd Cir. 2009) (additional citation and quotation marks omitted). For the reasons discussed above, I disagree that Gordon's motion to suppress presents a colorable constitutional claim, or that an evidentiary hearing is justified for that reason.

Gordon also seeks a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on the basis of his assertion that "the nature of the government's minimization records suggest that the government may have submitted false or misleading information to this Court as part of its ongoing progress reporting." ECF No. 452 at 20. A *Franks* hearing is required when "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause[.]" *United States v. D'Andrea,* 648 F.3d 1, 12–13 (1st Cir. 2011) (citing *Franks*, 438 U.S. at 155-56). "An allegation is made with 'reckless disregard for the truth' if the affiant in fact entertained serious doubts as to the truth of the allegations or where circumstances evinced obvious reasons to doubt the veracity of the allegations in the application." *United States v. Gifford,* 727 F.3d 92, 98 (1st Cir. 2013) (citation and

internal quotation marks omitted). "In the case of allegedly material omissions, recklessness may be inferred where the omitted information was critical to the probable cause determination." *Id.* at 98–99 (quotation omitted).

Gordon's support for his assertion that the government submitted false or misleading information is weak. *See* ECF No. 452 at 19-20. Gordon cites to the federal judiciary's statistics on wiretap reports as the foundation for his observation that courts that have ordered evidentiary hearings on motions to suppress wire intercepts "have sometimes found that essential requirements of the Wiretap Statute were in fact unsatisfied." *Id.* at 20 (citing *United States v. North*, 735 F.3d 212, 215-16 (5th Cir. 2013)). This argument falls significantly short of a substantial preliminary showing that a deliberately false statement, or a statement made with reckless disregard for the truth, was included by Agent Brown in any of the four warrant affidavits. *See United States v. D'Andrea,* 648 F.3d at 12-13. Accordingly, Gordon's request for a *Franks* hearing is denied.

## IV. CONCLUSION

For the foregoing reasons, Gordon's Motion to Suppress and Request for an Evidentiary Hearing (ECF No. 452) is **DENIED**.

**SO ORDERED.**

/s/ Jon D. Levy
U.S. DISTRICT JUDGE

Dated: March 23, 2015