**UNITED STATES DISTRICT COURT
DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | 2:14-cr-00069-JDL-11 |
| PIERRE AZOR, ) | |
| ) | |
| Defendant. ) | |

**ORDER ON DEFENDANT PIERRE AZOR'S MOTION TO SUPPRESS**

Pierre Azor seeks to suppress all evidence that was seized during a traffic stop at the Gray/New Gloucester toll booth on Interstate 95 in the early morning hours of March 22, 2014, including approximately 1,075 30-mg oxycodone pills. Azor argues that the police lacked both a reasonable articulable suspicion and probable cause to stop and search the taxi in which he was riding as a passenger. ECF No. 453. For the reasons discussed below, I deny the motion.

## I. FACTUAL BACKGROUND

In March 2014, agents of a United States Drug Enforcement Agency ("DEA") Task Force (the "agents" or "monitoring agents") were investigating a suspected drug trafficking conspiracy in Lewiston. Pursuant to a wiretap order authorized by this Court, the agents intercepted a series of cell phone conversations between co-defendant Romelly Dastinot ("Dastinot") and a man identified only as "Cash" over the course of three days, from March 19 to March 21. On March 19, the two men discussed a plan whereby Cash would travel to Boston to illegally purchase approximately 1,000 oxycodone pills—500 for himself and 500 for Dastinot—and then return to Maine where they would sell the oxycodone pills (they referred to the pills

as "blues" because of their blue color) for approximately 32 dollars per pill. On the same day, Dastinot called Cash and told him that he had been contacted by his supplier in Boston, and that the oxycodone pills were ready for purchase.

Shortly after noon on March 21, the monitoring agents intercepted a phone call in which Dastinot and Cash discussed Cash's travel arrangements to Boston later that afternoon. The two men also made plans for Dastinot to give money to Cash for his half of the purchase. Cash told Dastinot that he would take a 1:50 p.m. bus from Lewiston to Boston, but would return to Portland so that he would not be seen departing from and arriving at the same bus station. Cash also refused to go to an apartment located on Knox Street in Lewiston to get money from Dastinot because he thought the police presence there was "too hot," and he would be carrying too much money with him to merit the risk. Instead, Dastinot and Cash agreed to meet at a 7-Eleven convenience store in Lewiston, where Dastinot would pick up Cash and drive him to the Lewiston bus station. Dastinot told Cash that he would be accompanied by an "elderly" person.

After intercepting the calls between Dastinot and Cash, the monitoring agents contacted Task Force Agent Thomas Pappas, a Maine State Police trooper on assignment to the DEA Task Force, and informed him of the intercepted calls. Agent Pappas was then instructed to drive to the Lewiston bus station, located at the corner of Oak and Bates streets, to conduct surveillance. He positioned himself at the top of a parking garage located directly above the station, where he could see a Greyhound bus parked on the street below. Agent Pappas saw a red pickup truck parked directly

behind the bus and recognized it as belonging to Carrie Buntrock, a woman in her sixties whom Pappas recognized from his participation in the task force investigation. Agent Pappas continued to watch as a black male wearing a blue jacket and a black hat got out of Buntrock's truck and boarded the bus, which departed shortly thereafter at 1:50 p.m. After watching the bus leave, Pappas reported his observations to the monitoring agents and was told that they suspected the man who boarded the bus would return to Maine with a load of drugs.

Approximately eight hours later, at 10:00 p.m., the monitoring agents intercepted a telephone call to Dastinot from co-defendant Pierre Dubois in Boston. Dubois told Dastinot that he dropped a Haitian person off at South Station. The two men then talked about the significant risk that person was taking, with Dastinot jokingly stating that he would have to "bail out on him." The monitoring agents contacted Agent Pappas and told him that the man he observed boarding the Greyhound bus in Lewiston was possibly on a bus bound for Portland.

Agent Pappas drove to the Portland bus station, where he expected a bus from Boston to arrive late that evening. He watched from his unmarked police cruiser as the bus arrived and its passengers then departed from the bus station. Among the passengers, Pappas recognized the same man he had observed exiting Carrie Buntrock's truck and boarding the bus in Lewiston earlier that day. The man got into a taxi, which drove away and onto Interstate 295. Agent Pappas followed the taxi and watched it make its way onto the northbound lanes of Interstate 95, driving in the direction of Lewiston.

As he followed the taxi, Agent Pappas contacted Maine State Police trooper Robert Cjeka, who was in uniform and driving a marked Maine State Police cruiser. Agent Pappas had previously informed Trooper Cjeka that he was tracking a person whom he suspected of involvement in a drug transaction and asked him to assist by conducting a traffic stop of the taxi. Agent Pappas directed Trooper Cjeka to the taxi, and instructed him to continue following it and to stop it if he witnessed a traffic infraction.

Trooper Cjeka followed the taxi for approximately 10 miles on Interstate 95 before he observed it exceeding the posted speed limit at the Gray/New Gloucester toll booth,[1] at which point he activated his blue emergency lights and stopped the taxi. As he saw Trooper Cjeka stop the taxi, Agent Pappas called Maine State Police trooper Jerome Carr, a certified dog handler, whom Pappas had earlier asked to be prepared to respond to a traffic stop with Zarro, his drug-sniffing police dog. Agent Pappas now requested that Trooper Carr respond to Trooper Cjeka's traffic stop. Cjeka, meanwhile, had identified the taxi's driver, and then asked the passenger if he had any form of identification. The passenger handed over a Massachusetts driver's license identifying him as Vladimy Azor. Trooper Cjeka checked the passenger's identification on the computer system in his police cruiser and discovered that the license was suspended. Azor acknowledged this, and told Trooper Cjeka that he spent the night in Portland and was now travelling to Lewiston.

---

[1] Trooper Cjeka determined that the taxi was speeding by using a radar detector that his state police cruiser was equipped with. He saw the taxi driving 41 miles per hour in a 35 miles-per-hour zone.

Approximately 20 minutes after Cjeka stopped the taxi, Trooper Carr arrived at the scene with his drug-sniffing dog. Carr directed the dog to sniff around the outside perimeter of the taxi, moving counterclockwise from the driver's side to the passenger's side of the car. Azor was seated in the front passenger seat of the taxi with the window open. As the dog passed the front passenger window, he stood up on his hind legs, leaned into the open passenger window, and sniffed the sleeve of Azor's jacket, then immediately sat, indicating to Carr that the dog had detected the presence of illegal narcotics. Carr ordered the taxi driver and passenger out of the car and asked Trooper Cjeka to frisk Azor. During the frisk, Cjeka found a bus ticket showing that Azor had travelled from Boston to Portland just a few hours earlier, contradicting what Azor had previously told him. Shortly after Cjeka found the bus ticket, Trooper Carr searched underneath the front passenger seat of the taxi and found a "baseball size" plastic bag containing a number of blue pills. Cjeka arrested Azor and took him to the Cumberland County Jail, where Azor told him that he had given him a false name, and that his real name was Pierre Azor.

## II. LEGAL ANALYSIS

Azor argues that the police lacked probable cause to stop and search the taxi because the information that they obtained from the wiretap was insufficiently predictive to corroborate what they had observed at the Lewiston and Portland bus stations and on Interstate 95. ECF No. 453 at 4-5 (citing *Alabama v. White*, 496 U.S. 325, 331-332 (1990)). Azor also contends that the search was unjustified because the police lacked a reasonable articulable suspicion of wrongdoing, or that anyone present

in the taxi was dangerous. *Id.* at 5-6 (citing *Florida v. J.L.,* 529 U.S. 266, 272 (2000); *Michigan v. Long*, 463 U.S. 1032, 1051 (1983)).

Police have probable cause to conduct a search "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). "The principal components of a determination of . . . probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause." *Id.* Where a police officer has not personally witnessed a crime or suspicious activity, "the 'fellow officer' rule applies, so that as a general matter . . . the focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." *United States v. Winchenbach*, 197 F.3d 548, 555 (1st Cir. 1999); *see also, United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002) ("common sense suggests that, where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop.").

Azor dedicates the bulk of his brief to the Supreme Court's analysis of anonymous tips in *Alabama v. White*, 496 U.S. at 328-29, 331-32, and of corroboration of anonymous tips in *Florida v. J.L.*, 529 U.S. at 272. ECF No. 453 at 4-6. Yet there has been no suggestion in this case that the task force agents or State Police troopers involved in this case obtained any information about Azor from an anonymous tip.

6

Nor does Azor identify a case in which the holdings of *Alabama* or *Florida* were applied to wiretap evidence.

The information obtained via the wiretap and the personal observations of Agent Pappas, when viewed from the standpoint of a reasonable police officer, amounted to probable cause to stop and search Azor, and the taxi he was travelling in, in the early morning hours of March 22. The monitoring agents heard someone known as "Cash" affirmatively state his intention to travel by bus from Lewiston to Boston at 1:50 p.m. on March 21 in order to purchase hundreds of oxycodone pills, and then transport them back to Maine and sell them. They also intercepted the logistical details of Cash's trip to Boston, including (1) when, how, and where Cash would depart; (2) who would bring him to the Lewiston bus station; (3) when, how, and where Cash would return to Maine; and even (4) the retail price that Cash and Dastinot intended to charge for the oxycodone pills that Cash was obtaining. Agent Pappas' personal observations corroborated almost all of the information gathered from the wiretap and also identified "Cash" as the passenger in the taxi that Trooper Cjeka stopped. Accordingly, at the time of the stop there was probable cause to stop and search the taxi for contraband. That probable cause was further supported by the information the police obtained as a result of the stop. A certified, drug-sniffing dog indicated the presence of illegal narcotics, further corroborating all of the information the police had previously collected. Viewed objectively, the police had probable cause to stop the taxi, search Azor's person, and, ultimately, to search the

7

interior of the car for the presence of narcotics. The stop, search, and seizure were fully supported by probable cause.[2]

## III. CONCLUSION

For the reasons discussed above, the defendant's motion to suppress is hereby **DENIED**.

**SO ORDERED.**

This 23rd day of March, 2015.

                                                        /s/ JON D. LEVY
                                             U.S. DISTRICT JUDGE

---

[2] Accordingly, I have not analyzed the stop, search, and seizure under the less demanding reasonable articulable suspicion standard.